Case No. 23-2932

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

BANKRUPTCY ESTATE OF SANTOASHA HARRIS,

      Plaintiff-Appellant,

v.

CITY OF MILWAUKEE,
TERRENCE BRUMIRSKI, and
ABC INSURANCE CO.,

      Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Wisconsin
Case No. 20-CV-609
Magistrate Judge Nancy Joseph

**REPLY BRIEF OF THE PLAINTIFF-APPELLANT,
BANKRUPTCY ESTATE OF SANTOASHA HARRIS**

Austin Borton
SBN: 1097539
LEAVELL & BORTON, S.C.
723 S. Main Street
Racine, WI 53403
(262) 633-7322

April 2, 2024

1

# TABLE OF CONTENTS

**ARGUMENT**................................................................................................................**5**

**I. The Evidence Submitted by Harris in Opposition to the City's Motion Created, at the Very Least, a Genuine Issue of Material Fact that Should be Resolved by a Jury**........................................................................................................ **5**

    **A. Outdoor Trash Pickup was Never Harris' Duty as an Infrastructure Repair Worker Assigned to the Barricade Shop. The City's Argument that Pushing Her into that Position was not a Reassignment Does Not Pass Muster.** .......... **6**

    **B. Brumirski Possessed Apparent Authority to Take Tangible Employment Action Against Harris as a Matter of Undisputed Fact, Qualifying him as a "Supervisor" Under Title VII.** ............................................................. **8**

    **C. It is Immaterial that No "Tangible Employment Action" was Taken Against Harris for her to Sustain her Claims Against the City for the Actions of Brumirski.** ......................................................................................... **10**

**II. The City has not Proven its _Faragher-Ellerth_ Affirmative Defense as a Matter of Law to Extinguish Harris' Hostile Work Environment Claim under Title VII.** . **12**

    **A. The City Unreasonably Failed to Train its Employees on Reporting Sexual Harassment in the Workplace, and Harris Followed the City's Policy and did not act Unreasonably Taking into Consideration all Facts and Circumstances.** ....................................................................................... **12**

    **B. The Anonymous Letter Coupled with Harris' Complaints to Hardnett Demonstrate She Did Not Unreasonably Fail to Take Advantage of the City's Policy for Reporting Sexual Harassment.** ........................................................ **14**

**III. The City's Argument that it did not Intentionally Harass Harris, in violation of § 1983, is Based on the Disputed Fact that it was First Made Aware of Harris' Complaints in May of 2017. However, the Facts Demonstrate it was on Notice Much Sooner.** .................................................................................................... **19**

**IV. Harris has Demonstrated that the Actions Taken Against her Following her Report of Sexual Harassment in May of 2017 Were Materially Adverse and Motivated by a Retaliatory Motive. Harris' Retaliation Claims Should be Submitted to a Jury.** ........................................................................................ **21**

**CONCLUSION** ...................................................................................... **25**

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .................................................................. 14

*Bohen v. East Chicago,* 799 F.2d 1180 (7th Cir. 1986)........................................................... 18, 19

*Boone v. Mountainmade Found.,* 64 F. Supp. 3d 216 (D.C. 2014)............................................. 21

*Boyer-Liberto v. Fountainbleau Corp.,* 786 F.3d 264 (4th Cir. 2015) ......................................... 7

*Burlington Northern & Santa Fe Ry. V. White*, 548 U.S. 53 (2006) ...................................... 6, 21

*Cairel v. Alderden,* 821 F.3d 823 (7th Cir. 2016)......................................................................... 4

*Clark v. UPS,* 400 F.3d 341 (6th Cir. 2005) ....................................................................11, 15, 16

*Coates v. Sundor Brands, Inc.,* 164 F.3d 1361 (11th Cir. 1999) ............................................... 16

*E.E.O.C. v Mgmt. Hosp. of Racine, Inc.,* 666 F.3d 422 (7th Cir. 2012) ................................... 18

*EEOC v. Autozone, Inc.,* 692 Fed. Appx. 280 (6th Cir. 2017)................................................. 7, 8

*Erickson v. Wisconsin Dep't of Corrections*, 469 F.3d 600 (7th Cir. 2006)...............................11

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ...............................................11, 14, 16

*Hill v. American General Finance Inc.,* 218 F.3d 639 (7th Cir. 2000)........................................ 15

*Holly D. v. Cal. Inst. of Tech*., 339 F.3d 1158 (9th Cir. 2003) ................................................... 10

*Jones v. Vilsack*, 861 Fed. Appx. 58 (6th Cir. 2021) ................................................................. 21

*Lesiv v. Illinois Cent. R.R. Co*., 39 F.4th 903 (7th Cir. 2022) .................................................... 21

*Mary M. v. North Lawrence Community Schl. Corp.,* 131 F.3d 1220 (7th Cir. 1997) ................. 10

*McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473 (7th Cir. 1996) ........................................... 23

*Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986) ............................................................... 19

*Nischan v. Stratosphere Quality, LLC,* 865 F.3d 922 (7th Cir. 2017) ....................................... 16

*Onacle v. Sundowner Offshore Services, Inc.,* 523 U.S. 75 (1998) ............................................. 6

*Perry v. Harris Chernin, Inc.,* 126 F.3d 1010 (7th Cir. 1997)..................................................... 16

*Pesek v. Caterpillar Inc.,* 2012 U.S. Dist. LEXIS 104881 *15 .................................................. 23

*Pindak v. Dart,* 125 F. Supp. 3d 720 (N.D. Ill. 2015) ............................................................... 23

*Savino v. C.P. Hall Co.,* 988 F. Supp. 1171 (7th Cir. 1997) ................................................... 9, 10

*Skiba v. Ill. Cent. R.R. Co.,* 884 F. 3d. 708 (7th Cir. 2018) ......................................................... 4

*Torres v. Pisano,* 116 F.3d 625 (2nd Cir. 1997) ........................................................................ 15

*Vance v. Ball State Univ.,* 646 F.3d 461 (7th Cir. 2011) ........................................................... 21

*West v. Radtke*, 48 F.4th 836 (7th Cir. 2022) ........................................................................... 20

*Westra v. Credit Control of Pinellas*, 409 F.3d 825 (7th Cir. 2005) ................................................. 13

*Williams v. Phillips 66 Co.,* 72 F. Supp. 3d 938 (S.D. Ill. 2014) .................................................... 6

*Wragg v. Village of Thornton*, 604 F.3d 464 (7th Cir. 2010) ......................................................... 4

# ARGUMENT

## I.     The Evidence Submitted by Harris in Opposition to the City's Motion Created, at the very least, a Genuine Issue of Material Fact that Should be Resolved by a Jury.

The City contends that its own employee Ms. Graves' direct testimony is somehow inadmissible hearsay, (City Br., p. 9), and that Harris' arguments are only "supported by speculation or conjecture" and are insufficient to defeat its motion for summary judgment citing *Skiba v. Ill. Cent. R.R. Co.,* 884 F. 3d 708, 721-722 (7th Cir. 2018).  (City Br., p. 8.)  The City mischaracterizes a quotation from *Cairel v. Alderden,* 821 F.3d 823, 830 (7th Cir. 2016), which states that evidence to be considered on summary judgment, "must be admissible at trial, though 'the form produced at summary judgment need not be admissible." *Id.; quoting Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).  Here, Harris relied upon deposition testimony as required by F.R.C.P. 56 in support of her arguments opposing the City's motion for summary judgment.  *See* F.R.C.P. 56 ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record including depositions…")

The testimony came from the City's employee in a representative capacity, used against the City.  Ms. Graves' testimony is clearly not inadmissible hearsay, but direct testimony from a witness and admissible because not hearsay.  Harris has not attempted in any way to "obfuscate the legal issues" as argued by the City, (City's Br., p. 9), but merely applied the evidence to the law.

### A. Outdoor Trash Pickup was Never Harris' Duty as an Infrastructure Repair Worker Assigned to the Barricade Shop. The City's Argument that pushing her into that position was not a Reassignment Does Not Pass Muster.

The City admits Brumirski directly oversaw Harris' work and "had authority to determine what aspects of workers' essential job functions or day-to-day assignments needed to take place." (City's Br., p. 12.)   However, it claims that outdoor work was always a part of her essential job functions, so it cannot be said that Brumirski had the inherent authority to reassign Harris.  (*Id.* at p. 12–13.)   This argument contradicts the evidence and testimony, which demonstrated that outdoor work, picking up garbage, was never an essential function of Harris' work as an IRW assigned to the barricade shop.  (R.63-2, ¶34.)  This was, at minimum, a material fact issue for trial.

As argued in her brief in chief, Harris worked as an Infrastructure Repair Worker ("IRW") indoors from 2012 to present, manufacturing barricades in the barricade shop and having direct supervision of City Laborers who would work with her.  (Harris Br., p. 22 – 23, R.63-7, R. 68-2, R. 50-3, p. 164).  The City wants this Court to believe that reassignment to outdoor work in the harsh Wisconsin winters is somehow not a significantly harsher workplace environment, because the job description of IRW from January 14, 2016 included the possibility that the individual may be subject to work outdoors. (City Br., p. 17.)  However, reviewing the job description it contains nowhere a description specific to an IRW working in the barricade shop. Rather, it includes assignments involving street pavement repairs, including patching potholes and pavement removal among other things.  (R:68-2.)  It cannot be said to be undisputed fact, contrary to the City's assertion, that Harris' position as an IRW in the barricade shop also had an essential job function of working outside in the cold and picking up trash.

"Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Burlington Northern & Santa Fe Ry. V. White*, 548 U.S. 53 (2006); *quoting Onacle v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). The City has never argued that assigning an IRW that has worked in the barricade shop for years to outdoor work in the winter would not constitute "an unbearable change in job conditions where the employee is subjected to a . . . significantly harsher workplace environment." *Williams v. Phillips 66 Co.,* 72 F. Supp. 3d 938, 952 (S.D. Ill. 2014).

The undisputed testimony of another IRW, Paulette Lee, confirmed that reassignment to manual outdoor labor work after having been assigned to work in the barricade shop would be viewed by the employee as reassignment to a significantly harsher workplace environment:

> Q: So when you asked to have approval to work in the barricade shop from Arnold
> Boyd, did you have a reason why you wanted to go to the barricade shop?
> A: I wouldn't have been in the field.
> Q: Okay. That's outside in the cold?
> A: Outside, yeah.
> . . .
> Q: Okay. You knew generally that their work was inside and not outside?
> A: That was what was important.
> Q: That was the appeal?
> A: That it was inside, yeah.

(R.50-16, p. 20-21.)

The threat of reassignment from the barricade shop to outdoor field work was a material one, rising to the level that makes Brumirski Harris' supervisor under Title VII. The ability to reassign Harris to this type of outdoor work was exhibited by Brumirski's successor, Hardnett. (R.50-3, p. 103; R.50-16, p. 72-73; R.63-4, p. 22 of 54, Depo p. 82-83; R.63-5, p. 12 of 33, Depo p. 42; R.50-5, p. 17.) The City does not dispute that Brumirski held this authority, but simply believes that this assignment to harsh outside work was not a "reassignment." (City Br., p. 12-13.)

So, if this Court determines that outdoor, manual labor work in the field did not fall under Harris' job description as a matter of undisputed fact, then it compels a conclusion that Brumirski had the inherent authority to reassign Harris qualifying him as her supervisor under Title VII.

Considering all the circumstances, the undisputed facts showed that Brumirski had the inherent authority to take tangible employment action against her and was her supervisor. At a minimum, this is a question of material fact on this issue to be resolved by a jury and not as a matter of law against Harris.

**B. Brumirski Possessed Apparent Authority to Take Tangible Employment Action Against Harris as a Matter of Undisputed Fact, Qualifying him as a "Supervisor" Under Title VII.**

The City minimizes Harris' argument and confines its analysis to Brumirski's authority to conduct and to sign her performance reviews. (City's Br., p. 13). The City argues that "[t]his argument must fail because, as [Dan] Thomas testified, there are various strata of employees with differing responsibilities. Just because one individual can make a recommendation, does not mean that it will be followed." (*Id.* at p. 14.) The City cites to a 6th Circuit Case *EEOC v. Autozone, Inc.,* 692 Fed. Appx. 280, 281 (6th Cir. 2017), which held "the power to persuade" alone was insufficient to qualify someone as a supervisor under Title VII. *Id.* at 284. However, the 6th Circuit has distinguished the facts of *Autozone* from others where apparent authority was found because the supervisor possessing the authority would "rubber-stamp" the recommendations.

For example, in *Boyer-Liberto v. Fountainbleau Corp.,* 786 F.3d 264, 280 (4th Cir. 2015) the evidence of finding apparent authority included testimony by the employee asserting the apparent authority because she "had [the owner's ear and could have [the employee] fired." *Id.* at 279. This testimony alone was sufficient for the 4th Circuit to find that an employee's apparent authority rose to that of a supervisor under Title VII. *Id.* at 280.

By contrast, in *Autozone*, the alleged supervisory employee merely had the ability to "write up" and employee for misbehavior, whereas his superior who possessed that power "visited the Cordova store once a week, actively participated in its management, scheduled shifts, and interacted with the employees Townsel harassed. He did not blindly delegate his responsibilities to Townsel or 'merely sign the paperwork.'" *Autozone*, 692 Fed. Appx. at 283.

It is important to note that *Vance* did not expressly address the issue of whether the authority to take tangible employment action always requires that the individual be able to exercise that power with respect to the plaintiff. Rather, *Vance* noted in its discussion of the facts that the parties agreed the alleged harasser was not authorized to hire, fire, demote, promote, transfer, or discipline the plaintiff. *Vance* at 424-25.

The facts here from the accounts of multiple women are that Brumirski had the ear of his superior, Delleman. They were thought to be friends even outside of work, and Delleman rubberstamped whatever Brumirski recommended. (R.50-3, p. 39; R.63-4, p. 15 of 54, Depo p. 55.) The facts of this case are more akin to the facts and circumstances in *Fountainbleau,* where the employee was found to have exercised apparent authority as a *de facto* supervisor over her subordinates.

At a minimum, there is a reasonable inference that, in the light viewed most favorably to Harris, that Brumirski was delegated supervisory authority. Mr. Brumirski conducted and signed Ms. Harris' performance reviews when he became her supervisor from 2010 until his resignation in 2017. (R.50-4, p. 23 of 86, Depo p. 89.) Mr. Brumirski reported directly to Jeffrey Delleman who, the City admits, had the power to reassign, dock Ms. Harris' pay, and promote her. (R.50-4, p. 22-24 of 86, Depo p. 83-84, 89-90.) Mr. Brumirski himself testified in deposition that he had the ability to dock his subordinates pay before clarifying that upon his recommendation, Mr.

Delleman would authorize the pay withholding, again suggesting Mr. Brumirski himself believed he was delegated the authority to withhold pay from his subordinates:

> Q: Similarly, you had no authority to dock any City of Milwaukee employee's pay, correct?
> A: Attendance, yes, I did, if you were late.
> . . .
> Q: And regarding attendance, you mean as a supervisor you had the ability to document if one of your direct reports was tardy or failed to follow policy or was late, correct?
> A: Correct.

(R.50-5, p. 116.)

Mr. Delleman would rely on Mr. Brumirski's opinion as Mr. Brumirski saw Ms. Harris every single day, and Mr. Delleman rarely interacted with Harris or any other similarly situated IRWs. (R.50-5., p. 18.) At bottom, there is at least a dispute of material fact as to whether Brumirski was delegated authority to take tangible employment actions against Harris.

## C. It is Immaterial that No "Tangible Employment Action" was Taken Against Harris for her to Sustain her Claims Against the City for the Actions of Brumirski.

The City contends that Harris' *quid pro quo* claim fails because it claims (1) Brumirski was not her supervisor and (2) because he took no supervisor action against her. (City's Br., p. 16.) As discussed above, Harris established a prima facie case that Brumirski was her supervisor, or at least that it posed a fact issue for trial. Secondly, sister Circuits have recognized the "submission" category of *quid pro quo* claims which has been acknowledged also in this Circuit pre-*Vance* in *Savino v. C.P. Hall Co.,* 988 F. Supp. 1171 (7th Cir. 1997).

The Second and Ninth Circuit Courts of Appeals post-*Vance* have expressly held that when a supervisor implicitly or expressly communicates that an employee's submission to sexual conduct is a condition for continued employment, and a plaintiff does submit to such requests, that supervisor's conduct constitutes a tangible employment action and triggers and strictly establishes

employer liability. *See Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1162-64 (9th Cir. 2003) and *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 88-89 (2nd Cir. 2002).

This Circuit has acknowledged this theory pre-*Vance*, "'*quid pro quo* harassment occurs when the receipt of benefits or the maintenance of the status quo is conditioned on acquiescence to sexual advances.'" *Savino v. C.P. Hall Co.,* 988 F. Supp. at 1184*; quoting Mary M. v. North Lawrence Community Schl. Corp.,* 131 F.3d 1220 (7th Cir. 1997). "When a supervisor conditions the maintenance of a professional and pleasant work environment upon an employee's submission to his sexual demands, he is engaging in quid pro quo harassment to the same extent as if he conditioned the submission upon continued employment." *Id.* at 1184–1185.

"Liability for quid pro quo threats will not attach 'where a victim or plaintiff could not have reasonably believed that it was within the supervisor's power to affect the conditions of the plaintiff's job." *Id.* at 1185. This Court should affirmatively state that it continues to acknowledge the "submission" theory post-*Vance* as accepted by sister circuits and based on the Court's prior acceptance of it pre-*Vance.*

Viewing the evidence in the light most favorable to Harris, the evidence demonstrates that she reasonably believed Brumirski had the ability to take tangible employment actions against her such as reassignment, conducting poor performance reviews, and termination. Brumirski oversaw Harris' day to day activities, he conditioned Harris' ability to remain indoors working in the barricade shop and continued employment on her acquiescence to his advances.

If this Court finds that Brumirski was Harris' supervisor inherently or by delegation, or if there is a dispute of fact, Harris has an actionable *quid pro quo* claim despite no "tangible employment action" enacted against her by Brumirski.

**II.    The City has not Proven its *Faragher-Ellerth* Affirmative Defense as a Matter of Law to Extinguish Harris' Hostile Work Environment Claim under Title VII.**

**A.  The City Unreasonably Failed to Train its Employees on Reporting Sexual Harassment in the Workplace, and Harris Followed the City's Policy and did not act Unreasonably Taking into Consideration all Facts and Circumstances.**

The City claims, of course, that it acted reasonably to prevent sexually harassing behavior by having an anti-harassment policy.  The City quotes *Erickson v. Wisconsin Dep't of Corrections*, 469 F.3d 600, 606 (7th Cir. 2006), that "[p]revention can involve proactive steps such as constructing a reporting system for instances of sexual harassment, training employees about sexual harassment risks and what can be done to ameliorate them. . . and taking reasonable steps to prevent harassment once informed of a reasonable probability that it will occur." (City's Br., p. 21).  The City relies on simply having a policy to show it was not negligent.  However, simply having a policy does not absolve the City of liability:

> While the affirmative duty on the part of the employer will often include the requirement that it have some sort of sexual harassment policy in place, the duty does not end there. . . an inquiry that looks behind the face of the policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior.

*Clark v. UPS,* 400 F.3d 341, 349 (6th Cir. 2005), *citing Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998) (An employer may satisfy its burden if it has a "proven, effective mechanism for reporting and resolving" harassment).

The City attempts to downplay that Detria Hardnett was not a supervisor with mandated reporting requirements under the City's own policy.  It claims that Hardnett was not a mandatory supervisor with sexual harassment reporting requirements from 2012 to 2017.  (City Br., p. 24-25.)  It cites Hardnett's testimony that she believed she may have been a crew leader in 2012 but deferred to her employment records.  (City Br., p. 24.)  None of Hardnett's employment records were put into the record by the City despite being the custodian of them.  Rather, Hardnett's own

resume shows that she was a streets repair supervisor beginning in June of 2003. (R.63-8.) The City is the one attempting to mischaracterize the record. The undisputed facts of record supplied by her resume make her a supervisor.

Harris testified that she complained to Hardnett about Brumirski's unwelcomed sexual advances and physical touching as early as 2012. (R.50-3,p. 44-45, 106-108.) At the time, Hardnett was a streets repair supervisor, according to her own resume she submitted in 2017 when applying for Brumirski's position. (R.63-8.) Even Mr. Thomas admitted that Hardnett would have had a duty to report Harris' complaints when made, which Harris maintains was years in advance of the May 25, 2017 incident. (R.50-4, p. 22-24, 33-34 of 86, Depo p. 83-84, 89-90, 127-133.)

Further, Harris testified that Hardnett offered to, and in fact did, accompany her to the barricade shop in the mornings to hopefully prevent Brumirski from harassing Harris. (R.50-3, p. 44-45, 106-108.) Hardnett admitted that numerous people around DPW had referred to Brumirski as Harris' "stalker." (R.50-11, p. 20 of 60, Depo p. 70; R.50-3, p. 66-67, 70-71; R. 50-16, p. 43-44.) Hardnett acknowledged she had a duty to report Harris's complaint when she was informed of the May 25, 2017 incident, but failed to do so. (*Id*.; R.63-7.) Harris was not separated from Brumirski by the City until May 31, 2017. (R.63-4, p. 12 of 54, Depo p. 44.)

The City claims that, as Harris' friend, Hardnett accompanied her in the mornings to work to prevent Brumirski's known and complained of sexual abuse, and that as a "friend" this put her outside the obligations of a mandatory reporting authority. (City Br., p. 24-25.) This argument is incomprehensible and at minimum demonstrates that the City had an ineffective sexual harassment policy in place if it allowed a mandatory reporting employee to evade that duty by asserting they were "friends." Ms. Harris complied with the policy and received no help from the City for years, at minimum a fact issue.

The City's ignoring the harassment was corroborated by similarly situated female employees who informed mandatory reporters of the abuse Brumirski imposed on other women employees of the City, such as Ms. Carrie Graves. Graves reported to Rico Lopez and Brian Stankiewicz, whom the City does not contend were not mandatory reporting individuals under the City's own sexual harassment reporting policy, that Brumirski stated to her that he would "rape her in the truck wash before he retired." (R.63-4, p. 6 of 54, Depo p. 20; R.63-4, p. 9-10 of 54, Depo p. 32, 38; R.63-4, p. 9 of 54, Depo p. 32-33; R.63-4, p. 21 of 54, Depo p. 78.) No complaints were present in Mr. Brumirski's entire employment file regarding this report of harassment. (R.63-9.)

The City was granted a drastic remedy when it received summary judgment despite evidence demonstrating that the City did not act reasonably in preventing sexual harassment in the workplace. Mr. Brumirski harassed Ms. Harris to from 2012 until his resignation in 2017. Reports in compliance with the City's policy were never brought up the chain of command for one reason or another. Regardless, this failure demonstrates the City's unreasonableness failure to prevent and remedy reports of ongoing sexual harassment. It should not have been granted summary judgment on this issue.

### B. The Anonymous Letter Coupled with Harris' Complaints to Hardnett Demonstrate She Did Not Unreasonably Fail to Take Advantage of the City's Policy for Reporting Sexual Harassment.

The reasonableness of a parties' actions is typically a fact intensive undertaking to be decided by the trier of fact. *See Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005). The affirmative defense asserted by the City contains two essential elements: (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing

behavior" and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities by the employer . . ." *Faragher,* 524 U.S. at 807.

Harris wrote an anonymous letter and sent it to Dan Thomas in 2012 complaining of Brumirski's harassment of her and other women within DPW. (R.50-3, p. 23; R.50-12.) Harris followed the City's anti-harassment policy by contacting one of the options the City provided for reporting sexual harassment, Dan Thomas. (R.50-7.) Her complaint went unheard, and no investigation was initiated into Brumirski at any point in time until she retained counsel in May of 2017. (R.50-4, p. 40 of 86, Depo p. 156.)

Thomas claims to have never received the letter, despite Harris testifying that she mailed it to his office. (R.50-3, p. 36-37.) The City claims it never made it to its intended destination, but this is merely an assumption. Thomas admitted that he did not open his own mail and testified his office might have received it – "anything could have happened." (R.50-4, p. 15-16 of 86, Depo p. 56-59.)

Thomas admitted it was possible that the 2012 letter Harris wrote reached his office, but that he never saw it. (*Id*.) There is at least a dispute of material fact that Harris' letter reached Thomas. He did not recall reading it, and admitted it could have been mishandled by someone in his office as he does not open his own mail. (*Id*.)

A jury should decide whether they believe Thomas actually never received Harris' plea for help and an investigation into Brumirski for sexual harassment back in 2012. On a motion for summary judgment, the Court is bound to view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 255 (1986). Viewing these facts in the light most favorable to Harris, and drawing all reasonable inferences in her favor, based on Harris testifying that she authored the

2012 letter and sent it to Thomas, it cannot be said, as a matter of law that she unreasonably failed to take advantage of any preventative opportunities. (R.50-3, p. 23; R. 50-12.)

The City points to *Hill v. American General Finance Inc.,* 218 F.3d 639 (7th Cir. 2000), for the proposition that an anonymous letter is not enough to effectuate notice on an employer. (R.70, p. 18-19.) In *Hill*, this Court determined that an anonymous letter coupled with the fact that, when confronted with it the plaintiff did not admit to writing it, the letter was not a "reasonable effort at notification." *Id.* at 643. Unlike *Hill,* Harris has never denied writing the letter. The City simply claims to have never received it. The actual receipt by the City of Harris' 2012 anonymous letter is a genuine dispute of material fact.

This coupled with the undisputed fact that 1. The City failed to act when it was provided constructive notice through Ms. Harris' complaints to Ms. Hardnett, and similarly Ms. Graves' complaint to Mr. Lopez and Mr. Stankiewicz of Brumirski's sexual harassment, and 2. the workplace common knowledge in the DPW was that Brumirski was a stalker and harasser of women, and particularly Harris's stalker, and that 3. only when Harris retained counsel, with the imminent threat of potential litigation, did the City take steps to investigate Brumirski, compels reversal for determination of the facts.

It was the City's burden to show that under no set of circumstances could a jury find that the City acted unreasonably in eliminating sexual harassment it had notice of or knew of it. "[O]nce an employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it." *Torres v. Pisano,* 116 F.3d 625, 637 (2nd Cir. 1997). "Thus, regardless of whether the victimized employee actively complained, prong one of the defense ensures that an employer will not escape vicarious liability if it is aware of the harassment but did nothing to correct it or prevent it from occurring in the future." *Clark v. UPS,* 400 F.3d 341, 349

(6th Cir. 2005), *citing Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1014 (7th Cir. 1997). Simply having a policy, as the City argues, is not dispositive:

> While the affirmative duty on the part of the employer will often include the requirement that it have some sort of sexual harassment policy in place, the duty does not end there. . . an inquiry that looks behind the face of the policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior.

*Id., citing Faragher,* 524 U.S. at 806 (an employer may satisfy its burden if it has a "**proven, effective** mechanism for reporting and resolving" harassment).(bold added.)

As Harris argued in her initial appellate brief, and is unrebutted by the City, in *Clark v. UPS,* the employer UPS, argument was rejected that the "low to mid-level supervisors who witness [the harassment] had no duty to convey their knowledge to UPS, because these supervisors were not high enough in the company hierarchy and had no authority to control [the harasser]." *Clark,* 400 F.3d at 350. The Court quickly dismissed this argument: "[t]his argument might have merit but for the fact that UPS itself has, through its sexual harassment policy, placed a duty on *all* supervisors and managers to 'report incidents of sexual harassment to the appropriate management people.'" *Id.; quoting Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1364 (11th Cir. 1999); *see also Nischan v. Stratosphere Quality, LLC,* 865 F.3d 922, 932 (7th Cir. 2017) ("Stratosphere is accountable to the standard of care it created for itself"). The City similarly placed this duty on its managers and supervisors as articulated by the City's Dan Thomas.

The City admits Hardnett received notice from Harris of sexual harassment by Brumirski on May 26, 2017, but Harris has testified in deposition to notifying Hardnett well in advance of that date. (R.50-3, p. 44-45, 106-108.) Harris testified that she complained to Hardnett about Brumirski's unwelcomed sexual advances and physical touching as early as 2012. (*Id*.) At the time, Hardnett was a streets repair supervisor. (R.63-8.) Mr. Thomas admitted that Hardnett would have a duty to report Harris' complaints when made, which Harris maintains was years in advance of

the May 25, 2017 incident when Brumirski's final disgusting act took place when you went under Harris' pants and touched her vagina and licked his hand. (R.50-4, p. 22-24, 33-34 of 86, Depo p. 83-84, 89-90, 127-133.) Further, Harris testified that Hardnett offered to, and in fact did, accompany her to the barricade shop in the mornings to hopefully prevent Brumirski from harassing Harris. (R.50-3, p. 44-45, 106-108.) Further, Hardnett acknowledged she had a duty to report Harris's complaint when she was informed of the May 25, 2017 incident, but failed to do so. (*Id.*; R.63-7.) Harris was not separated from Brumirski by the City until May 31, 2017. (R.63-4, p. 12 of 54, Depo p. 44.)

While Hardnett denies speaking with Harris about Brumirski's harassment of her, she admits that numerous people around DPW had referred to Brumirski as Harris' "stalker." (R.50-11, p. 20 of 60, Depo p. 70; R.50-3, p. 66-67, 70-71; R. 50-16, p. 43-44.) Based upon this admission, and admissible as an employee admission, and the totality of the circumstances, it is reasonable to infer that Hardnett was not properly trained to understand her reporting requirement of Harris' sexual harassment complaints against Brumirski prior to May 25, 2017 or that she knew that her failure ultimately resulted in her promotion to Brumirski's position, for which could now be in jeopardy due to her failure to report, ongoing, pervasive sexual harassment complained of by Harris.

Additionally, former City employee Edmond Smith provided a sworn statement that states that he was never trained on how to properly report complaints of sexual harassment. (R.50-16, p. 30.) Ms. Graves, Ms. Lee, and Ms. Youngblood all testified in deposition similarly and supportive of this fact. (*Id.*) Further, the City of Milwaukee produced the entirety of what it claims to be Brumirski's personnel file, and there is but one page stating that Brumirski attended a February 26, 1999 anti-harassment training session. (R.50-5, p. 53-55.) The City admits that the only

mandatory sexual harassment training occurred after Harris' investigation and Brumirski resigned, in 2018. (R.50-18, p. 7, 9.) In response to a request for production of documents requesting all sexual harassment training materials from 2001 to the present, the City produced nothing but their anti-harassment policies. (*Id.*)

The City argues that the record contains "no evidence to establish there was insufficient training," (City's Br., p. 25), which is inconceivable in light of the undisputed facts discussed above. In *E.E.O.C. v Mgmt. Hosp. of Racine, Inc.,* 666 F.3d 422 (7th Cir. 2012), the Court found the following was enough for a jury to determine that insufficient training of a sexual harassment policy demonstrated the employer was negligent in its training:

> Del Rio knew that she had an absolute duty to report sexual harassment allegations to upper management, yet she did not report Powell's complaints because, in her opinion, Powell did not seem to be "afraid" of Gutierrez. Similarly, Dahl knew that she had an absolute duty to report such allegations to upper management. Yet, in the face of Powell's allegations that Gutierrez was "sexually and physically abusing [her] and other female servers," she failed to report Powell's complaints. On these facts, a rational jury could have concluded that, not only was the policy and the management training ineffective, but the protections offered by them were illusory.

*Id.*

This same failure by individuals who had an absolute duty to report these complaints as evidenced by the testimony of Harris and Graves relative to Hardnett, Lopez and Stankiewicz establish that a rational jury could find that the City was negligent and Harris did not act unreasonably.

## III. The City's Argument that it did not Intentionally Harass Harris, in violation of § 1983, is Based on the Disputed Fact that it was First Made Aware of Harris' Complaints in May of 2017. However, the Facts Demonstrate it was on Notice Much Sooner.

The facts of this case are similar to *Bohen v. East Chicago*, 799 F.2d 1180 (7th Cir. 1986), where this Court determined that the facts and evidence supported a finding that the Plaintiff had

been intentionally harassed by the City of East Chicago. The City, here, attempts to distinguish the facts of *Bohen* and this case by stating that the Plaintiff in *Bohen* had complained numerous times, through many channels, of the harassment she received from her supervisors and fellow employees and that Harris never made a formal complaint until May 25, 2017. (City's Br., p. 28).

The District Court concluded in this case, as did the City argue, incorrectly that Harris did not complain through official channels. As argued previously, the City's policy allowed for reporting to supervisors of sexual harassment that should then be reported up the chain of command. Harris did so, reporting to Hardnett who was a supervisor and mandatory reporting individual under the City's policy. Hardnett did nothing and instead accompanied Harris to work to attempt to dissuade Brumirski from harassing her over a number of years. Harris even testified that Hardnett was the one who suggested that she record Brumirski. (R.50-3, p. 106.)

The City also wrongly argues that municipality in *Bohen* did not have an "anti-harassment policy." (City's Br., p. 28). However, clearly the City of East Chicago had a policy as there were agreed to reporting channels, it simply was not written down - - "the department did not even have a **written policy** against sexual harassment until after Bohen had been fired." *Bohen,* 799 F.2d at 1187. (bold added). Additionally, as argued previously, Brumirski was Harris' supervisor, despite the City's argument to the contrary.

Finally, the City blanketly argues that "Harris cannot establish that the City intended to harass her. . ." (City's Br., p. 29). However, a Plaintiff can prove an actionable § 1983 sexual harassment claim "by showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination." *Bohen,* 299 F.2d at 1187; *citing Meritor Savings Bank v. Vinson*, 477 U.S. 57, 54 (1986). The undisputed facts show a conscious failure of the City, like in *Bohen*, to protect Harris from the

abusive conditions created by Brumirski. The widespread knowledge of the abuse Harris suffered at the hands of Brumirski was known by numerous employees, and at least one supervisor, Hardnett. (R.50-11, p. 20 of 60, Depo p. 70; R. 50-3, p. 66-67, 70-71; R.50-16, p. 43-44; R.50-4, p. 22-24, 33-34; R.63-8.) Multiple women have testified that they had heard Brumirski referred to as Harris' "stalker." (*Id.*) The City provided no sexual harassment training until after Brumirski's resignation. (R.50-18, p. 7, 9.)

Viewing the facts and circumstances of this case in the light most favorable to Harris demonstrate that there was a conscious failure by the City to protect plaintiff from the abusive conditions created by Brumirski which amounts to intentional discrimination. At the very least, a jury should have the opportunity to make this determination on disputed facts.

**IV.**     **Harris has Demonstrated that the Actions Taken Against her Following her Report of Sexual Harassment in May of 2017 Were Materially Adverse and Motivated by a Retaliatory Motive. Harris' Retaliation Claims Should be Submitted to a Jury.**

The City contends that no reasonable jury could find that the actions of the City were materially adverse or grounded in a retaliatory motive. (City's Brief, p. 30) Specifically, the City believes that (1) removing Harris, the individual complaining of extreme sexual harassment, from her day to day job to sit in a truck and "dumpster watch" all day was to protectively separate Harris from her harasser while the City investigated her complaints. (*Id.* at p. 32) This was to any objectively reasonable observer banishment to the gulag.

Further, the City wrongly cites to *West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2022), to assert three broad categories of materially adverse actions in a retaliation claim. (City's Brief, p. 31). However, *Radtke* was not a retaliation claim, it was a discrimination claim. *Id.* "For a retaliation claim, a materially adverse action is defined as an action 'that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected

activity.'" *Lesiv v. Illinois Cent. R.R. Co*., 39 F.4th 903, 911–912 (7th Cir. 2022). "That standard is easier to satisfy than the comparable standard for Title VII discrimination claims, which is 'limited to discriminatory actions that affect the terms and conditions of employment.'" *Id; citing Burlington*, 548 U.S. at 64

The City also cites to *Jones v. Vilsack*, 861 Fed. Appx. 58 (6th Cir. 2021), to justify its relocation of Harris as legitimate. However, the facts of *Jones* are completely dissimilar. The retaliation complained of, permanent relocation to a different office, occurred twenty months after the asserted protected activity. *Id.* at 64. As the District Court and 6th Circuit determined, the "temporal proximity considerations mitigated a finding of a causal connection between the filing of Jones's EEO complaint and his permanent reassignment, given the gap between the two." *Id.* at 64.

Here, the reassignment happened immediately, lasted six weeks, and modified Harris' work schedule that caused her to suffer additional childcare expenses, a materially adverse action to Harris. (R.50-3, Depo. p. 72, 76, 80.) The City blanketly postures that this inconvenience is trivial, in contravention of the law of this Circuit which has recognized that where an, "employer exploits a known vulnerability of an employee . . . [such that] a change in assignments like an altered work schedule, [it] conceivably might amount to an adverse employment action." *Vance v. Ball State Univ.,* 646 F.3d 461, 474 (7th Cir. 2011). "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." *Boone v. Mountainmade Found.,* 64 F. Supp. 3d 216, 244 (D.C. 2014). Harris was affected in exactly this way. The temporal proximity and the harm done by it weigh in favor of a finding that a reasonable jury could view the evidence and find in favor of Ms. Harris that her reassignment to dumpster watch was retaliatory in violation of Title VII and § 1983.

Second, as argued previously, the City contends that after Hardnett's promotion to Brumirski's position following his resignation, her demands that Harris pick up trash while assigned to the barricade shop has always been a part of her job duties. (City's Br., p. 32). However, this contravenes the undisputed facts and evidence as argued previously.

A reasonable jury could conclude that Harris was never asked or required to pickup trash prior to Brumirski's exit, and that this job duty was not required of her by the City and in her position. Further, Hardnett's demands for Harris to, now, pick up trash as her immediate supervisor were punitive as she gained a promotion with Brumirski's resignation. (R.50-11, p. 22 of 60, Depo p. 80.) Hardnett knows that if Harris' version of the facts were proven, Hardnett's failure to report puts her job in jeopardy. It can be reasonably be inferred that Hardnett attempted to force out Harris from her employment by reassigning her to perform tasks not in her job description, like picking up trash, refusing to give her a performance review, and isolating Harris in the barricade shop without help, all in retaliation for bringing Hardnett into the investigation and this litigation.

Similarly, the new job duty is materially adverse and would dissuade similarly situated employees. This is supported by the deposition testimony of Paulette Lee. Lee testified that she understood that working indoors, not outside picking up garbage, was a significant condition of employment to her and something she sought after when she applied to work in the barricade shop, much like Harris. (R.50-3, p. 103; R.50-16, p. 72-73; R.63-4, p. 22 of 54, Depo p. 82-83; R.63-5, p. 12 of 33, Depo p. 42.) Graves testified that she has no knowledge of any promotion one can obtain at the City for performing general trash pickup. (R.63-4, p. 12 of 54, Depo p. 44.) This new dead-end job duty of trash pick up is far from a trivial deviation from Harris's job and is materially adverse as demonstrated by the evidence.

Examining the totality of the actions taken against Harris, a jury could reasonably conclude that they were retaliatory in nature and materially adverse. "The Seventh Circuit has previously left open the possibility that a 'plaintiff might have a cognizable claim of retaliation based on acts which, although seemingly appropriate and nondiscriminatory when considered in isolation, bespeak retaliation when considered together.'" *Pesek v. Caterpillar Inc.,* 2012 U.S. Dist. LEXIS 104881 *15; *quoting McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 483 n. 7 (7th Cir. 1996). All of these actions were taken nearly immediately upon Harris return to the barricade shop. Her office was torn down, a camera was placed directly above her work space, her managers refused to engage with her, and she is now asked to pick up trash. (R.50-11, p. 29-30 of 60, Depo p. 109-110.) (R.50-3, p. 103; R.50-16, p. 72-73; R.63-4, p. 22 of 54, Depo p. 82-83; R.63-5, p. 12 of 33, Depo p. 42; R.50-5, p. 17.) Ms. Harris has put forth sufficient evidence to prove her retaliation claim and have the merits of it decided by a jury.

Finally, as argued in her initial brief, Harris alleged in her complaint that the City is liable under § 1983 for "failing to provide sexual harassment training to its employees" and "failing to properly train and supervise Terrence Brumirski regarding sexual harassment in the workplace." (R.1, ¶¶65-67.) The City has not responded to this argument in its responsive briefing specific to the retaliation claim. "The plaintiff must show that the failure to train reflects a conscious choice among alternatives that evinces a deliberate indifference to the rights of the individuals with whom those employees will interact." *Pindak v. Dart,* 125 F. Supp. 3d 720, 756 (N.D. Ill. 2015).

Undisputedly, there is only evidence of one instance where Brumirski was provided sexual harassment training in 1999. (R.63-6). The City only required mandatory sexual harassment training for its supervisors in 2018, after Brumirski resigned. (R.50-18, p. 7, 9.) The City produced none of its sexual harassment training materials in discovery despite request for it, which

reasonably implies they do not exist. (*Id.*). The City's failure to train its supervisors on sexual harassment reporting rises to the level of deliberate indifference. Harris' claim under §1983 and should have remained for trial on the City's failure to train.

## CONCLUSION

For the reasons stated above, this Court should rule that Brumirski was Harris' supervisor for purposes of Title VII, or have the issue be decided by the trier of fact.  Similarly, this Court should reverse the District Court's decision and rule that Harris can proceed to trial on the claims for sexual harassment and discrimination against the City and its employee Brumirski under both *quid pro* quo and hostile work environment.

Further, Plaintiff should be allowed to proceed to trial on her claims for retaliation under Title VII.  Finally, this Court should reverse the District Court's decision dismissing Appellant's 42 U.S.C. § 1983 claims against the City and she be allowed to proceed to trial.

Dated this 2nd day of April, 2024.

LEAVELL & BORTON, S.C.

By:      */s/ Austin Borton*
         Austin Borton
         SBN: 1097539
         Attorneys for Plaintiff-Appellant
         723 S. Main Street
         Racine, WI  53403
         (262) 633-7322
         austin@jeffreyleavell.com

**CERTIFICATE OF COMPLIANCE WITH**
**FRAP RULE 32(a)(7), FRAP RULE 32(g) and CR 32(c)**

The undersigned, counsel of record for the Plaintiff-Appellant, states the following in compliance with F.R.A.P. Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P Rule 32(a)(7), for a brief produced with a proportionally spaced font. The length of this brief is 6,808 words.

Dated this 2nd day of April, 2024.

LEAVELL & BORTON, S.C.

By:    */s/ Austin Borton*
Austin Borton
SBN: 1097539
Attorneys for Plaintiff-Appellant
723 S. Main Street
Racine, WI 53403
(262) 633-7322
austin@jeffreyleavell.com

**PROOF OF SERVICE**

The undersigned, counsel for the Plaintiff-Appellant, hereby certifies that on April 2, 2024, I electronically filed Plaintiff-Appellant's Reply Brief with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit Court and to counsel for Defendant-Appellee, Attorney Emile H. Banks, Jr. and Attorney Katherine A. Headley using the CM/ECF system.

Dated this 2nd day of April, 2024.

LEAVELL & BORTON, S.C.

By:     */s/ Austin Borton*
        Austin Borton
        SBN: 1097539
        Attorneys for Plaintiff-Appellant
        723 S. Main Street
        Racine, WI  53403
        (262) 633-7322
        austin@jeffreyleavell.com